**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANTHONY GOLDEN,**

                                   **Plaintiff,**                    **5:11-CV-654 (NAM)**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

                                   **Defendant.**

_____

**APPEARANCES:**

Steven R. Dolson, Esq.
6000 N. Bailey Avenue, Suite 1 A
Amherst, New York 14228
For Plaintiff

Hon. Richard S. Hartunian, United States Attorney
Karen T. Callahan, Esq., Special Assistant United States Attorney
Social Security Administration
Office of Regional General Counsel, Region II
26 Federal Plaza - Room 3904
New York, New York 10278

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

                    **MEMORANDUM DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and asks the

Court to reverse the Commissioner's decision to deny his application for disability insurance

benefits and remand this matter for payment of benefits. Presently before the Court are the

parties' cross-motions for judgment on the pleadings. Dkt. Nos. 11, 13.

**II.     BACKGROUND**

## A.    Factual and Procedural History

Plaintiff was born on June 2, 1958. He graduated from high school in 1977. After attending tractor trailer driving school in 1990, plaintiff worked as a truck driver from 1991 to March 2009.

Plaintiff filed an application for disability insurance benefits with the Social Security Administration on July 23, 2009, alleging he became disabled on March 27, 2009 and that he suffers: traumatic arthritis in the right hip; degenerative joint disease; obesity; obstructive sleep apnea; stroke; hypertension and vascular disease; intermittent syncope and vertigo; degenerative disc disease of the lumbar spine; and gastroesophageal reflux disease. After obtaining plaintiff's medical records and holding a hearing, Administrative Law Judge Viviane W. Mittleman issued a decision finding that plaintiff was not disabled. On April 14, 2011, the Appeals Council denied plaintiff's request for review and the ALJ's decision became the Commissioner's final decision. This action followed.

## B.    Medical Evidence

On June 27, 2003, plaintiff went to see Michael Wiese, M.D., an orthopedist, regarding "intermittent right buttock pain radiating into his groin." Dkt. No. 8, Administrative Transcript, p.243 ("T. 243"). Plaintiff told Dr. Wiese that "over the last 10 years" he had "episodes where" his "buttock, low back, and right hip will lock up" rendering him "unable to ambulate and sometimes will have to crawl" but that "[e]ventually, things will loosen up and he will be better." T. 243. Plaintiff told Dr. Wiese that "over the last 6 months" his symptoms have increased "and he has had 9 episodes of this severe pain". T. 243. Plaintiff stated that he did not have any significant injury to his low back but that he had injured his right hip and lower

leg in a motorcycle accident "about 25 years ago". T. 243. Plaintiff, who was a truck driver at

the time, described the pain "as a gripping, tight pain in his buttock and groin region" but

stated that it did not "radiate below the knee." T. 243. He told Dr. Wiese that he believed he

was losing motion in his hip and that he had "difficulty after he has been driving the truck for

long periods and attempts to get out of the truck" because of stiffness. T. 243.

Dr. Wiese examined plaintiff and found:

He is walking with a stable gait without any significant antalgic elements. Stance
alignment is neutral. Back shows excellent flexibility without discomfort. He has
no tenderness over either side joint, no pain to pelvic rock. He does have
discomfort in his right hip with terminal internal/external rotation, which lacks
about 15 [degrees] of abduction when compared to the opposite side. He has no
significant pain to the motion arc . . . . Leg lengths are equal. Negative Faber,
negative log roll. Calf is soft. Neurovascular exam is intact. Deep tendon reflexes
are 2+ and symmetric.

T. 243.

X-rays indicated "LS spine unremarkable" and "early arthritis in the right hip." T. 243.

Dr. Wiese observed that "[t]here may be a loose ossicle off the superior lateral aspect of the

acetabulum" and "symmetric narrowing" but no "bone-on-bone contact at this time." T. 244.

Dr. Wiese diagnosed "[t]raumatic arthritis right hip, mild to moderate". T. 244. Dr.

Wiese recommended physical therapy for plaintiff's "very stiff hip" and that plaintiff "consider

changing his job to a more sedentary type job to try to preserve the hip as long as possible" but

noted that he "will inevitably need a total hip replacement." T. 244. Dr. Wiese planned to see

plaintiff in four weeks "to see how this therapy has helped" and observed that plaintiff might

"benefit additional testing to rule out loose body in the hip for consideration of either a

3

cortisone injection or possibly a hip arthroscopy." T. 244.[1]

On August 21, 2006, plaintiff went to the emergency department at Upstate Medical Center in Syracuse, New York after falling. T. 298. Plaintiff reported: "having a fall today preceded by dizziness and room spinning sensation . . . . getting slowly dizzy, lightheaded . . . then falling to the floor being unable to stand for a little while, then coming back to baseline." T. 298. Plaintiff also described "similar episodes happening over the last two weeks." T. 298. Plaintiff reported having a history of hypertension and that he was on two hypertensives, one of which he started "about 3 weeks ago". T. 298. Plaintiff denied losing consciousness, having headaches, difficulty swallowing, double vision, or slurred speech but stated that he had "some sort of numbness in the right side of his face." T. 298.

Romer Mosquera, M.D. conducted the emergency department consultation and diagnosed: "Acute vertigo, likely secondary to an inner ear problem. I cannot exclude the possibility for presyncopal, syncopal event secondary to recent adjustment of blood pressure medications." T. 299. A CT scan yielded "no evidence for an acute intracranial process." T. 306. Meclizine was prescribed for plaintiff. T. 301.

Plaintiff went to Marcellus Medical Center on October 5, 2006, and reported that he had been having a "vertigo problem" and that he had been in a motor vehicle accident on September 8 or 9, 2006. Plaintiff explained that he "got a spell of vertigo" while driving I was just driving" and "ended up in the guardrail". T. 290. Plaintiff stated that it "has been a while" since his "last dizzy spell". T. 290-91.

On July 29, 2009, plaintiff went to the emergency department at Upstate Medical

---

[1]There is no evidence in the record that plaintiff saw Dr. Wiese again.

Center after passing out. T. 348. According to hospital records, plaintiff reported:

> He was standing, cleaning his windows when he felt he was going to fall and fell on the right side, hit the right side of his neck and fell on the ground. As soon as he got up, he had left-sided chest pain. He thought he might have hit his chest. The pain was described as sharp and stabbing and was not associated with diaphoresis or palpitations.

T. 348. During a physical examination at the hospital, Burk Jubelt, M.D., found minimal pedal edema, "5/5 strength in the upper and lower extremities bilaterally except for anterior tibialis on the right which is 5-/5", and "40%-70% decrease in pinprick in the right arm and leg, mild decrease in vibratory sense bilaterally". T. 351. A CT scan of plaintiff's cervical spine showed no "acute spinal traumatic injury," but showed "degenerative disease resulting in spinal cord neural foraminal narrowing", "severe right facet arthropathic changes at C4-C5 level with erosive changes" and "small disc protrusion at C5/6". T. 351, 353. Plaintiff also had a CT scan of his head, which did "not demonstrate any acute intracranial process". T. 351. Plaintiff's primary diagnoses at the time of discharge were: "[c]hest pain ? musculoskeletal. Ruled out for myocardial infarction" and "[l]eft ventricular diastolic dysfunction on echo". T. 348.

On September 15, 2009, Kalyani Ganesh, M.D. examined plaintiff at the Commissioner's request. T. 361. Plaintiff told Dr. Ganesh that he has had pain in his low back and right hip since a motorcycle accident and "several other injuries over a period of time." T. 361. Dr. Ganesh noted that plaintiff's background information indicated that "the right hip is traumatic arthritis, mild to moderate." T. 361. Dr. Ganesh noted that plaintiff's current medications were accupril, metoprolol, norvasc, and aspirin. T. 361.

Plaintiff reported sharp pain and discomfort in his right hip and down his right leg and that he fell down "[s]ometimes". T. 361. Plaintiff also stated that he had pain "all the time" in

his right hip and that it hurt to "sit for long, stand for long" and that he had "to get up and walk around." T. 361. Plaintiff complained of having chest pain "quite often" on the right side. T. 361. Plaintiff was using a cane "which he got on his own this year." T. 361.

Regarding his daily activities, plaintiff told Dr. Ganesh: "He can cook three days a week, cleaning two, laundry and shopping one. He showers once, dressing five days a week. Activities; he watches TV, listens to the radio, reads." T. 361.

Dr. Ganesh noted that plaintiff had "a limp favoring the right", and that he could not squat or walk on his heels or toes. T. 362. Dr. Ganesh wrote that plaintiff's "use of the cane did not appear absolutely necessary" and that plaintiff did not need help changing for the exam, was able to rise from a chair "without difficulty" and could get on and off the exam table without help. T. 362.

During the musculoskeletal portion of the examination, Dr. Ganesh found that plaintiff's "cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." T. 363. Plaintiff had no scoliosis, kyphosis, or abnormality in his thoracic spine. T. 363. Plaintiff's lumbar spine showed flexion of 90 degrees and extension of 10 degrees. T. 363. Plaintiff's lateral flexion and rotation was 10 degrees and his straight leg raise was "negative bilaterally." T. 363. Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally. T. 363. Dr. Ganesh found plaintiff's strength to be 5/5 in his upper and lower extremities" and that he had no "evident sublaxations, contractures, ankylosis, or thickening. T. 363. Plaintiff's joints were stable but he had tenderness in his "right SI joint." T. 363.

Plaintiff had a "feeble" knee jerk, and his "ankle jerk" was absent bilaterally. T. 363.

Dr. Ganesh found no significant varicosities, trophic changes or muscle atrophy in plaintiff's extremities. T. 363. Plaintiff's hand and finger dexterity were intact and his grip strength was 5/5 bilaterally. T. 363.

Dr. Ganesh listed five diagnoses: history of chronic right hip pain; traumatic arthritis right hip; lower back pain; high blood pressure; and history of chest pain. T. 363. Dr. Ganesh found his prognosis fair and stated that plaintiff had: "[n]o gross limitation sitting and the use of upper extremities" but a "[m]oderate limitation standing, walking, and climbing." T. 364.

Plaintiff had an x-ray of his right hip on September 15, 2009, which demonstrated "no evidence of acute fracture or dislocation" but showed degenerative joint disease "superiorly with subchondral cyst formation". T. 365.

Plaintiff was seen at Syracuse Community Health Center on November 6, 2009 by Chanele Burgun, M.D. He complained of hip and leg pain and depression, for which Dr. Burgun prescribed Zoloft, and hyperlydemia. T. 369. He saw Dr. Burgun again on January 13, 2010 regarding his blood pressure, which was still "uncontrolled", and for medication refills. T. 371. Plaintiff reported that his depression was stable and he was off Zoloft but that he continued to have hip pain. T. 371.

Plaintiff saw Dr. Burgun on April 7, 2010 regarding his blood pressure, which was "controlled" on medication. T. 386. Plaintiff complained of hip and leg pain. T. 386. Dr. Burgun found plaintiff's motor strength to be 5/5 in the lower and upper extremities and straight leg raising was negative bilaterally. T. 387.

Plaintiff saw Dr. Burgun on July 14, 2010 regarding his blood pressure, which was "uncontrolled" but plaintiff was "off meds". T. 384. Dr. Burgun gave plaintiff a prescription

for blood pressure medication and instructed him to return in two weeks. T. 384. Dr. Burgun found plaintiff's motor strength to be 5/5 in the lower and upper extremities. T.385.

Plaintiff saw Dr. Burgun on August 4, 2010 regarding his blood pressure, which was "well controlled". T. 382. Plaintiff complained of hip and leg pain. T. 382.

### III.   Administrative Hearing

On September 1, 2010, the ALJ conducted a hearing regarding plaintiff's application for disability benefits. Plaintiff, who was represented by counsel, and James Newton, a vocational expert, testified. T. 26-27. Plaintiff testified his primary problems were his hip, "the nerve damage on the right side of the leg" and hypertension. T. 29. Plaintiff testified that on July 29, 2009, he was doing some work at home on a ladder when his "hip kind of locked . . . in place", he lost his balance and fell. T. 30. Plaintiff stated he was admitted to Upstate Medical Center "for a couple days". T. 30. Plaintiff testified that his doctor at Community Health Center had recommended that he have a hip replacement but that he had no health insurance and could not afford surgery. T. 32.

Plaintiff stated that he has been living with his mother since he stopped working. T. 30. Plaintiff stated that he cleans up after himself, washes the dishes and tries to do his own laundry. T. 30. Plaintiff testified that he goes up one flight of stairs to go to bed at night but otherwise stays "mostly downstairs". T. 31-32. Plaintiff stated that he reads books and watches TV and tries to stay still because he does not know when he "might have" his "leg go that severe, like it did before when I went to the hospital." T. 32.

Plaintiff stated that he could drive a car to go to appointments and the grocery store. T. 33. Plaintiff testified that he could push a cart at the grocery store and carry one or two bags,

weighing at most eight pounds. T.33. Plaintiff explained that carrying any more weight would cause more hip and leg pain and his leg "tends to give out". T. 34. Plaintiff testified that numbness in his right arm also affects his ability to carry items. T. 40.

Plaintiff testified that he can bend to tie his shoes by placing them on the bathtub. T. 38. Plaintiff stated that he does not have trouble reaching his arms over head. T.39. Plaintiff testified that if he did have trouble reaching for something, across the dinner table, for instance, he would "just ask somebody to pass it." T. 39.

Plaintiff testified that with his cane, which was not prescribed by a doctor, he "can walk four blocks", T. 34, but that it takes "hours" to recover. T. 39. Plaintiff stated that with the cane he is able to do chores. T. 34. Plaintiff stated that he can sit thirty to forty-five minutes before his leg "goes numb", then he has "to get up and start walking somewhere to get the blood flowing." T. 35. Plaintiff testified that he takes aspirin for the pain. T. 35.

The vocational expert testified that an individual plaintiff's age, 52, with a high school education and similar past relevant work, who could "lift or carry ten pounds frequently, 20 pounds occasionally", had to "avoid heights", could occasionally climb and who required "a sit/stand option", but "could sit, stand or walk about six hours out of an eight-hour day, or totally do all three for eight hours" could not perform plaintiff's past relevant work as a truck driver but could perform "exertionally light" and "unskilled" work as a "ticket seller", "gate attendant" or "parking lot attendant". T. 42-43.

The vocational expert testified that if the same individual would, in addition to the above limitations, need frequent breaks, need to have the "sit/stand option" and to be able to "move around and stretch" and "be away from a particular station every half hour to an hour"

"for 15 minutes", such limitations would preclude "all competitive employment". T. 44.

## IV. ALJ's Decision

To be eligible for Social Security disability benefits, a claimant must establish "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

On September 24, 2010, using the five-step evaluation process, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 27, 2009, the alleged onset date of his disability. T.15. At step two, the ALJ found that plaintiff suffered from the following severe impairments: "traumatic arthritis in the right hip/degenerative joint disease, obesity, obstructive sleep apnea, s/p stroke, hypertension (well controlled) and vascular disease, intermittent syncope and vertigo, degenerative disc disease of the lumbar spine, and gastroesophageal reflux disease". T. 15. The ALJ found these

impairments "cause more than minimal limitation in the claimant's ability to perform basic work activities." T. 15.

At step three, the ALJ found that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."

At step four, the ALJ found that plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that permits the claimant to alternate between sitting, standing, or walking at will; that requires only occasional climbing; and does not involve concentrated exposure to heavy machinery, heights, or other hazards." T. 15.

At step five, the ALJ found that plaintiff could not perform his past relevant work and that his limitations impeded his ability to perform the full range of light work. The ALJ therefore relied on the testimony of the vocational expert, who stated even with additional limitations, plaintiff could perform "exertionally light" and "unskilled" work as a "ticket seller", "gate attendant" or "parking lot attendant" and concluded that plaintiff was not disabled. T. 19.

## V.    DISCUSSION

Plaintiff argues that: (1) the ALJ erred when determining his residual functional capacity; (2) the ALJ's credibility determination is not supported by substantial evidence; and (3) that the hypothetical question the ALJ posed to the vocational expert was not supported by substantial evidence.

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether plaintiff is disabled. Rather, the Court must examine the

Administrative Transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw*, 221 F.3d at; *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). "Substantial evidence means = such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

A.  **Residual Functional Capacity ("RFC")**

Plaintiff argues that when determining his RFC, the ALJ failed to consider the effects of his obesity, use of a cane and nonexertional impairments (bending, reaching, squatting and crouching, vertigo, fatigue and numbness in his legs), on his ability to work. Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). To ascertain a claimant's RFC, an ALJ must assess his exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push and pull. See 20 C.F.R. § 404.1545(b). The ALJ must also consider nonexertional

limitations or impairments, including impairments that result in postural and manipulative limitations. *See* 20 C.F.R. § 404.1545(b), 20 C.F.R. Pt. 404, Subpt. P, Appendix 2, § 200.00(e).

Here, the ALJ determined that plaintiff could perform light work that permits him "to alternate between sitting, standing, or walking at will; that requires only occasional climbing; and does not involve concentrated exposure to heavy machinery, heights or other hazards." T.15. Light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking and standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 1567(b).

In determining plaintiff's RFC, the ALJ considered plaintiff's testimony, which she found credible and consistent with the medical evidence "for the most part", as well as the medical opinions of consultative examiner Dr. Kalyani Ganesh and plaintiff's treating physician, Dr. Michael Wiese, the orthopedist who advised plaintiff to consider "changing his job to a more sedentary-type job." T. 18.

During examination, Dr. Ganesh noted that plaintiff had a "limp favoring the right" but "appeared to be in no acute distress". T. 362. Dr. Ganesh found plaintiff could not walk on his heels and toes and could not squat but could get "on and off exam table" and "rise from chair without difficulty." T.362. Dr. Ganesh found that plaintiff had full range of motion in his hips, knees and ankles and that strength was "5/5 in upper and lower extremities." T.363. As a result

of the examination, Dr. Ganesh opined that plaintiff had no gross limitation in sitting", that plaintiff could use his upper extremities, and that he had a moderate limitation in his ability to stand. T.363. Thus, the ALJ's determination that plaintiff can perform the exertional requirements of light work is supported substantially by the reports of Dr. Ganesh and Dr. Wiese and is not contradicted by any of the other medical evidence in the record. Indeed, plaintiff does not argue that the ALJ's determination regarding his exertional impairments is erroneous. Rather, plaintiff contends that the ALJ erred by failing to consider his nonexertional impairments, obesity and use of a cane when making her residual functional capacity determination.

### 1. Obesity

Plaintiff contends that this matter should be remanded because the ALJ failed to consider his obesity when determining his residual functional capacity. Plaintiff, however, provided no medical evidence showing that obesity limited his ability to work. *See Britt v. Astrue*, 486 F.App'x 161, 163 (2d Cir. 2012) (finding the plaintiff's argument that the ALJ erred when he determined that his obesity was not a severe impairment "because he did not furnish the ALJ with any medical evidence showing how these alleged impairments limited his ability to work."). Accordingly, plaintiff's contention is without merit.

### 2. Cane

Plaintiff asserts that the ALJ failed to consider his need to use a hand-held assistive device, i.e., a cane, in order to walk. Social Security Ruling 96–9p states: "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and

describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96–9p, 1996 WL 374185, at *7; *see also Miller v. Astrue*, 538 F.Supp.2d 641, 651 n.4 (S.D.N.Y. 2008) (where there was no evidence that plaintiff required a cane at all times and where treating physicians did not opine that she was required to use cane, plaintiff's use of cane did not factor into finding her able to perform sedentary work). Here, there is no evidence in the record that would support a finding that plaintiff's use of a cane was medically necessary. Accordingly, the ALJ did not err by excluding it from her residual functional capacity determination.

### 3. Nonexertional Impairments

Plaintiff argues that the ALJ failed to consider the effects of his nonexertional impairments on his residual functional capacity: difficulty bending, reaching, vertigo and fatigue and an inability to squat. Plaintiff further argues that the ALJ should have included these limitations in the hypothetical she posed to the vocational expert.

Plaintiff asserts that he is limited in his ability to bend. Although he testified that he had difficulty bending to put on his shoes, the medical evidence does not support a finding that he was limited in his ability to bend. When examining plaintiff, Dr. Ganesh found: "Cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. No scoliosis, kyphosis, or abnormality in the thoracic spine. Lumbar spine flexion 90 degrees, extension 10 degrees." T. 363. Thus, the ALJ's decision to omit bending as a nonexertional limitation is supported by substantial evidence.

Plaintiff asserts that his ability to reach is limited. At the hearing, however, plaintiff testified that he can reach "just far enough" and that his "manners" prevent him from reaching

across the dinner table, but if he did find it difficult he would "just ask somebody to pass it." T. 39. Plaintiff also stated that he had no trouble reaching over his head. T.40.

Plaintiff argues that the numbness he experiences is a nonexertional limitation that impacts his functional capacity. At the hearing, when the ALJ asked plaintiff how long he could sit before he had to get up, plaintiff responded: "As soon as I feel my leg going numb, that's a sign I've got to move . . . ." T.35. Plaintiff explained that he has to get up and "walk around the room". T.35. The ALJ's residual functional capacity finding, however, which "permits the claimant to alternate between sitting, standing, or walking at will", accommodates this impairment. T.15.

Plaintiff contends that the ALJ should have considered his vertigo as a nonexertional limitation. The medical evidence shows that plaintiff suffered a number of episodes of vertigo, in 2006 and an episode of syncope in 2009, for which he was admitted to the hospital. While medically documented, the ALJ failed to acknowledge this issue when determining plaintiff's RFC and did not discuss how vertigo or syncope would impact his functional capacity. Thus, remand is required to enable the ALJ to determine what impact this nonexertional impairment has on plaintiff's RFC and whether it would affect his ability to perform the jobs discussed by the vocational expert.

Plaintiff argues that the ALJ's failure to incorporate his inability to squat or crouch into the RFC determination. Indeed, Dr. Ganesh noted during the consultative examination that plaintiff could not squat. T. 362. While the inability to squat might not significantly erode the occupational base in the context of light work, *see* SSR 83-14 ("to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch

and would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job)"), because the Court is remanding this matter for further consideration, the ALJ should consider the impact of this limitation on plaintiff's RFC.

### B.    Credibility

Plaintiff asserts that the ALJ did not apply the proper legal framework when assessing his credibility and that her finding that his complaints were not fully credible is not supported by substantial evidence. When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)). If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c) (3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his pain are

consistent with the objective medical and other evidence. *See* Social Security Ruling 96-7p, 1996 WL 374186, at *2; *see also Cloutier v. Apfel*, 70 F.Supp.2d 271, 278 (W.D.N.Y. 1999) (holding that although the ALJ's decision contained a discussion of the medical evidence and a summary of the plaintiff's subjective complaints, the decision did not provide a sufficient analysis of the evidence to support the lack of credibility finding).

When rejecting subjective complaints of pain, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief [.]" *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987). If the Commissioner's findings are supported by substantial evidence, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984). A reviewing court's role is merely to determine whether substantial evidence supports the ALJ's decision to discount a claimant's subjective complaints. *Id.* (quotations and other citations omitted).

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ applied the correct legal standard in assessing plaintiff's credibility. Nothing in the decision indicates that the ALJ assigned anything more than limited weight to her own observations of plaintiff or that the ALJ relied exclusively upon her observations in assessing plaintiff's credibility. The ALJ discussed plaintiff's daily activities and noted that plaintiff does his own dishes and laundry, drives to the grocery store and doctor's appointments, but spends most of his time reading and watching television. The ALJ also discussed plaintiff's subjective complaints and the frequency and intensity of his symptoms, including his testimony that "extra weight associated with lifting and carrying aggravates his pain and causes his leg 'to give out'"; after

sitting for 30-45 minutes, his leg gets "numb"; numbness in his right arm hinders his ability to carry objects; and bending was problematic but that "he is able to manage his difficulties", if he elevates his shoes to the bathtub, for instance, "then [he] is able to bend over and tie them." T.17. The ALJ also noted that the only medication plaintiff takes for leg pain is aspirin. Consequently, the Court finds that the ALJ properly assessed the factors enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(vi) and § 416.929(c)(3)(i)-(vi).

In this case, taken as a whole, the record supports the ALJ's determination that some of plaintiff's claims were not entirely credible. The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain and adequately specified the reasons for discrediting plaintiff's statements.

Plaintiff asserts that the ALJ failed to take his strong work history when considering his credibility. "To be sure, 'a good work history may be deemed probative of credibility'". *Carvey v. Astrue*, 380 F. App'x 50, 53 (2d Cir. 2010) (quoting *Schaal,* 134 F.3d at 502 (work history, however, is "just one of many factors" appropriately considered in assessing credibility). The ALJ specifically noted, however, plaintiff's "love for truck driving and his desire to return to his past employment", and found this "admirable" but concluded the that medical evidence did not support plaintiff's contention that his impairments rendered him unable to perform any work.

## C.    Vocational Expert - Hypothetical Question

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work. 20 C.F.R. §§ 416.920, 416.960. Ordinarily, the Commissioner

meets this burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). Sole reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's limitations. *Id.* at 606. For example, use of the grids as the exclusive framework for making a disability determination may be precluded where, as here, plaintiff's physical limitations are combined with non-exertional impairments which further limit the range of work he can perform. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp*, 802 F.2d at 603; *see also Melchior v. Apfel*, 15 F. Supp. 2d 215, 58 (N.D.N.Y. 1998) (stating "where nonexertional limitations significantly diminish the ability to perform a full range of work, it is appropriate that the ALJ present testimony from a vocational expert").

The ALJ should elicit testimony from the expert by posing hypothetical questions. If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y. 1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater*, 932 F. Supp. 497, 503 (S.D.N.Y. 1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

In this case, the ALJ based her finding that plaintiff was not disabled on the testimony of a vocational expert. At the hearing, the ALJ asked the vocational expert whether there was any light work that a 52-year-old individual, with a high school education and past relevant work as a truck driver, who must avoid heights but could do occasional climbing and who needed a "sit/stand option" but "could sit, stand or walk about six hours out of an eight-hour day, or totally do all three for eight hours", could perform. The vocational expert responded that such an individual could do work as a "ticket seller" or "gate attendant". T.43. Plaintiff argues that the hypothetical question posed to the vocational expert omitted his nonexertional impairments. Because, as discussed above, the ALJ failed to consider the impact of plaintiff's vertigo and syncope on his RFC, such limitations were not presented to the vocational expert. Accordingly, on remand, after determining how plaintiff's vertigo and syncope and inability to squat or crouch impact his RFC, the ALJ should present any additional limitations to a vocational expert for consideration of whether there are any jobs that exist in significant numbers in the national economy that plaintiff can perform.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 13) is **DENIED**; and it is further

**ORDERED** that plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is **GRANTED**; and it is further

**ORDERED** that this case is **REMANDED** to the Commissioner for further proceedings in accordance with this Memorandum Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment for plaintiff and

**Close this Case**.

**IT IS SO ORDERED.**

Dated:  May 29, 2014
         Syracuse, New York

_Norman A. Mordue_
Norman A. Mordue
U.S. District Judge